IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01121-RBJ
*Consolidated with 1:20-cv-01881-RBJ-KLM; 1:20-cv-01134-RBJ; 1:20-cv-01163-RBJ-KLM; 1:20-cv-01176-RBJ; 1:20-cv-01468-RBJ-KLM; 1:20-cv-01475-RBJ; 1:20-cv-01529-RBJ; 1:20-cv-01585-RBJ-KLM; and 1:20-cv-01364-KLM*

MICHAEL McCAULIFFE,
MCKENNA CONNOLLY,
STEPHEN CONTI,
STEVEN BEILEY,
TERRY CHECHAKLI,
NORMAN CHENEY, and
MATTHEW BALKMAN, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE VAIL CORPORATION,
d/b/a Vail Resorts Management Company d/b/a Vail Resorts, Inc.,

      Defendant.

---

## ORDER ON MOTION TO DISMISS

---

Plaintiffs were unable to use ski passes they had bought from defendant, the Vail Corporation ("Vail"), after defendant closed its ski resorts due to the COVID-19 pandemic. Plaintiffs brought this putative class action lawsuit asserting contractual, quasi-contractual, and state consumer protection claims and seeking refunds for the unused portions of their passes. Defendant moved to dismiss all claims under Rule 12(b)(6). ECF No. 74. For the reasons stated below, defendant's motion is GRANTED.

1

## I.   BACKGROUND

Vail operates 37 "mountain ski resorts and urban ski areas" (collectively, "ski areas" or "ski resorts") across the world.  ECF No. 62 at ¶17.  The ski areas operate only during ski season, which typically begins in mid-to-late October and lasts through at least April, though it can extend as late as June.  *Id.* at 19.  The "core" ski season is typically shorter.[1]

Individuals wishing to access Vail's ski areas for the 2019-2020 ski season could choose to purchase either a lift ticket or a pass.  *Id.* at ¶18.  Lift tickets provided limited access to a particular ski area on specific days.  *Id.*  Passes provide more flexible access.  *See id.* at ¶19.

Vail sold at least five kinds of passes: Epic Passes, Epic Local Passes, regional Epic Passes, specialty Epic Passes, and Epic Day Passes.  The Epic Pass promised passholders "unlimited, unrestricted access" to Vail's "best resorts" and a few days of skiing at some other ski areas.  *Id.* at ¶21; ECF No. 101-1.  The Epic Local Pass, advertised to those who wanted to "[a]ccess the best skiing at great value," ECF No. 100-2 at p.1, promised "unlimited, unrestricted access" to many resorts and "some access—either a specific number of days or holiday-restricted access—to the remainder of Vail's ski areas."  ECF No. 62 at ¶22.

Regional Epic Passes and specialty Epic Passes[2] promised access to specific ski areas, sometimes on particular days of the week, and were marketed to provide access to ski areas for the entire 2019-2020 season.  *Id.* at ¶¶23–26.

---

[1] The "core" season for 2020-2021 ran from December 8, 2020 until April 4, 2021.  ECF No. 83 at p.9.  The record does not indicate the core season for 2019-2020, the season at issue in the lawsuit, but both parties seem to assume it would have been around the same dates.
[2] Specialty passes were sold to specific individuals like military veterans, their families, and local students.  ECF No. 62 at ¶25.

The Epic Day Pass provided passholders with between 1 and 7 days of access to most resorts. *Id.* at ¶28. They were marketed to "guests who know they want to ski and ride just a few days and may still need time to plan [their trips]" and offered "discounts of up to 50 percent off lift ticket window prices" unlocked by selecting in advance the number of days a guest wished to ski or ride. ECF No. 101-3 at p.2.

Vail's website, from which all named plaintiffs purchased their ski passes, stated that 2019-2020 passes were not "eligible for a refund of any kind." ECF No. 62 at ¶31. Vail's Season Pass Deposit & Cancellation Policy stated that "[t]he passholder also acknowledges that this pass is non-refundable unless Pass Insurance has been purchased." ECF No. 102-1 at p.1. The website's terms and conditions provided that its use was governed by the laws of the State of Colorado. ECF No. 62 at ¶29.

As COVID-19 spread across the country in early 2020, reports linked infection clusters to Colorado ski resorts. *Id.* at ¶37. Vail suspended operation of its North American ski areas on March 15, 2020 and, shortly thereafter, closed its ski areas for the remainder of the 2019-2020 ski season.[3] *Id.* at ¶¶38–39. At that time Vail refused to provide any type of refund to passholders. *Id.* About a month later, on April 27, 2020, Vail announced that it would issue credits to passholders impacted by the shutdown. *Id.* at ¶40. The credits, which varied from

---

[3] Plaintiffs acknowledge that governors and other state and local officials throughout the country issued orders requiring non-essential businesses, including some or all of Vail's resorts, to implement various prevention measures or close entirely. ECF No. 62 at ¶36. The Court takes judicial notice that on March 14, 2020 the governor of Colorado ordered all Colorado ski resorts to close for one week and later extended the closure order through May 22, 2020. Jason Blevins & Jesse Paul, *Colorado Governor Orders All Ski Resorts to Close For at Least a Week in Extraordinary Move*, The Colorado Sun, (March 14, 2020), https://coloradosun.com/2020/03/14/jared-polis-executive-order-ski-resorts/; Antonio Olivero, Closure of Ski Areas Statewide Extended Through May 22, 9News, (May 1, 2020), https://www.9news.com/article/news/health/coronavirus/gov-jared-polis-extends-statewide-ski-area-closure-through-may-22/73-d74680bf-dcc4-4337-b7d0-be3719659bb2.

20% to 80% of the pass purchase price based on the number of days that pass had been used, could be redeemed by purchasing a 2020-2021 pass on or before September 17, 2020. *Id.* at ¶40–41.

The named plaintiffs all had planned to use their passes after the date Vail closed its ski areas. *Id.* at ¶¶8–14. Most plaintiffs requested refunds directly from Vail. *See id.* All expected their pass would provide unlimited access throughout the 2019-2020 ski season and would not have purchased their pass, or would have paid substantially less for it, had they known that Vail "would not provide the full benefits of the Pass, while retaining all of the money it collected for the Pass." *Id.*

Plaintiffs brought this action individually and on behalf of a putative nationwide class consisting of "[a]ll persons in the United States who purchased any Epic Season Pass or an Epic Daily Pass that had unused days after March 14, 2020." *Id.* at ¶42. Plaintiffs assert fourteen claims: (1) breach of contract; (2) breach of warranty; (3) breach of implied covenant of good faith & fair dealing; (4) unjust enrichment; (5) money had & received; and, on behalf of putative subclasses, (6) – (14) violations of various California, New York, Illinois, Florida, and Washington State consumer protections statutes.

Vail moved to dismiss all claims under Rule 12(b)(6) for failure to state a claim. ECF No. 74; Fed. R. Civ. P. 12(b)(6).[4]

## II.   STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts

---

[4] Judge Moore partially granted a similar motion to dismiss in a parallel case against Alterra Mountain Co. and IKON Pass, Inc., sellers of the IKON Ski Pass. *See* Order on Motion to Dismiss, ECF. No. 94, Goodrich v. Alterra Mountain Co., No. 1:20-cv-01057-RM-SKC (D. Colo. July 25, 2021).

4

to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pled allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681. However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). The court may consider evidence beyond the complaint without converting a motion to dismiss to one for summary judgment if the documents are central to the claims, referred to in the complaint, and if the parties do not dispute their authenticity. *City. of Santa Fe, N.M. v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002).

## III.    ANALYSIS

### A.  Consideration of Materials Outside the Pleadings

Generally, a court ruling on a Rule 12(b)(6) motion may consider only the contents of the complaint. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). A court may, however, consider additional documents that are attached to the complaint or incorporated by reference into the complaint. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). A court may also consider indisputably authentic documents that are both referred to in the complaint and central to the plaintiff's claim. *Id.*; *see also Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).

Plaintiffs' complaint cites and quotes various statements made by Vail on its website. These include advertisements, policy statements, and disclosures about Epic Passes (ECF No. 62 at ¶21 n.2), Epic Local Passes (*id.* at ¶ 22 n.3), Epic Day Passes (*id.* at ¶28 n.5), Vail's deposit and cancellation policy (*id.* at ¶30 n.6), Vail's 2020 fiscal results (*id.* at ¶19 n.1), and Vail's credits offered to passholders impacted by the COVID-related shutdowns (*id.* at ¶40 n.2). Plaintiffs claim, and I accept at this stage of litigation, that these statements formed part of the contract between themselves and Vail.  *See* ECF No. 62 at ¶52.  At the Court's request, plaintiffs submitted screenshots of many webpages they cite.  ECF No. 101-1–4; ECF No. 102-1.

I find that the documents and webpages cited by plaintiffs are incorporated by reference in plaintiffs' complaint.  Alternatively, I find that the documents and webpages are authentic, referred to in the complaint, and central to plaintiffs' claims.  In either case I find it appropriate to consider these documents and webpages at this stage of litigation.  *See GFF Corp.*, 130 F.3d at 1384.

## B. <u>Breach of Contract</u>

To recover on a breach-of-contract claim, a plaintiff must show (1) the existence of a contract; (2) the plaintiff's performance; (3) the defendant's failure to perform; and (4) resulting damages to the plaintiff (causation).  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1033 (10th Cir. 2018).  The parties agree that a contract exists, and that plaintiffs fully performed their obligations.  ECF No. 62 at ¶¶51–53; ECF No. 74 at p.3.  They contest only whether defendant failed to perform.  Because the adequacy of defendant's performance depends on defendant's contractual obligations, I will first determine the contract's meaning and then assess defendant's actions.

6

Under Colorado law, which both parties agree governs the contract, "[c]ontract interpretation is a question of law for the court." *Spring Creek*, 887 F.3d at 1017 (quoting *Copper Mountain, Inc. v. Indus. Sys., Inc*., 208 P.3d 692, 696 (Colo. 2009)) (alteration in original). The Court bears in mind that:

> The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties. . . . To determine the intent of the parties, the court should give effect to the plain and generally accepted meaning of the contractual language . . . [and] should be wary of viewing clauses or phrases in isolation, . . . instead reading them in the context of the entire contract, seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless.

*Id.* at 1018 (quotation marks omitted). "On a motion to dismiss, allegations in a complaint do not overcome contradictory statements in the text of a contract." *Id.*

1.  Epic Passes and Epic Local Passes

Plaintiffs claim that Vail breached its contract "by retaining the consideration received from Plaintiffs and the Class while closing its ski resorts for the remainder of the season." ECF No. 62 at ¶54. According to plaintiffs, Vail's breach occurred as a result of two actions: closing ski resorts *and* retaining the money paid by plaintiffs. *See id.* at ¶55 ("Vail's decision to retain the monies paid by Plaintiffs and the Class while closing its resorts deprived Plaintiffs and the Class of the benefit of their bargains."). The complaint implies that Vail could have performed under the contract by either keeping its ski areas open longer or by issuing refunds for closures.

Plaintiffs claim that Vail's contractual obligations stem from its promises to provide "unlimited, unrestricted access" to ski areas. ECF No. 62 at ¶51. Defendant responds that Vail's disclaimer that Epic Passes were "not eligible for a refund of any kind" supersedes this. ECF No. 74 at p.4. Squaring these two statements requires contextual analysis and common sense.

7

To construe the contract, I answer three questions: First, what access did Vail have to provide to its ski areas? Second, how long did Vail have to provide that access? Finally, did Vail have to refund part of the passes if it failed to deliver the promised access despite its no-refund clause?

On the first question, plaintiffs allege that Vail promised, and therefore must provide, "unlimited, unrestricted access" to its ski areas. ECF No. 62 at ¶51. This promise can neither be taken at face value nor wholly ignored. Literal "unlimited, unrestricted access" would grant passholders free reign to ski after business hours or enter restricted areas like private offices and boiler rooms. *See* ECF No. 74 p.6. The parties did not reasonably expect such access.

Instead, Vail's promise to provide "unlimited, unrestricted" access is best understood in contrast to "limited" and "restricted" access guaranteed elsewhere. Vail imposed a cap on the number of days that an Epic Pass would grant admission to certain partner resorts. It labeled this admission policy "[l]imited access." *See* ECF 101-3 at p.1 ("The Epic Pass offers . . . [l]imited access to partner resorts, including: seven days each at Telluride, Sun Valley, Snowbasin, and the Resorts of the Canadian Rockies; five consecutive days at Hakuba Valley's ten ski resorts in Japan; and five consecutive days at Japan's Rusutsu Resort.") I find therefore that when Vail promised "unlimited . . . access" to certain resorts, it meant that passholders could use their passes as many times as they wanted without a cap. Elsewhere, Vail discussed "restrictions" to some resorts for Local Epic Passes. *Id.* It specified that passes with "restrictions" were not good for admission on certain holidays. *See id.* ("The Epic Local Pass [provides] . . . "[u]nlimited access with holiday restrictions to: Park City, Heavenly, Northstar, Kirkwood and Stowe."). I therefore find that when Vail promised "unrestricted access," it meant that there would be no

8

holiday blackout dates. "Unlimited, unrestricted access" meant access without holiday blackout dates or any cap on the number of days a pass would grant admission.

On the second question, of how long Vail promised to provide access to its ski areas, plaintiffs allege that Vail promised access during a "ski season." *See* ECF No. 62 at ¶¶8, 51. Finding this allegation uncontradicted by the record and uncontested by defendant, I accept it at this stage.

The parties disagree, however, about the meaning of a "ski season" and the extent of Vail's discretion to close its resorts. Plaintiffs argue that a ski season's length is an objective fact. It ends when "snow conditions [are] such that skiing and snowboarding [are] not possible." ECF No. 62 at ¶ 20. According to plaintiffs, Vail had no discretion to determine the end of a ski season. Vesting Vail with such discretion, plaintiffs claim, would permit Vail to "close its ski resorts at any time for any reason, or not open at all, and passholders would have no recourse." ECF No. 83 at p.3.

Defendant disputes that an objective end date exists for a ski season. They claim that "the ski season fluctuates and can include closures, both temporary and season-ending, for a variety of reasons beyond Vail's control." ECF No. 74 at p.5–6. This inherent uncertainty meant that Vail could not and did not promise a ski season of specific length. *Id.* Instead, Epic Passes promised only the ability to "choose when, where, and how often to use the Epic Pass while resorts are open." *Id.* at p.6. Defendant argues that the contract gave them discretion to determine when to open resorts, and that this discretion was constrained by the implied covenant of good faith. ECF No. 86 at p.2.

My "starting point" in contract interpretation "is the plain language of the contract and the intent of the parties as expressed in that language." *State Farm Mut. Auto. Ins. Co. v. Nissen*,

851 P.2d 165, 166 (Colo. 1993).  Neither the plain language nor the parties' expressed intent support plaintiffs' contention about the ski season's end date.  I find that the contract required Vail to keep resorts open until it determined, in good faith, that skiing and snowboarding safely were no longer possible.

While plaintiffs correctly point out that the contract did not allow Vail unfettered discretion to open or close its resorts, their attempt to graft a specific objective test onto the contract is unpersuasive.  To start, plaintiffs fail to identify a textual basis for their proposed definition of a ski season.  *See* ECF No. 72 at p.2.  Moreover, the contracting parties did not reasonably expect the ski season to end only when "snow conditions were such that skiing and snowboarding were not possible."  ECF No. 62 at ¶ 20.  Skiing and snowboarding may be "possible" even when unacceptably dangerous.  Imagine snow conditions on a certain slope were such that 51% of skiers make it down the mountain without a hitch but the other 49% get seriously injured.  Passholders would not reasonably expect Vail to keep this slope open even though — as the 51% prove — skiing is "possible."

Instead, I find that the contracting parties reasonably expected Vail to keep its resorts open while skiing and snowboarding *safely* were possible.  To the extent Vail had discretion to determine when skiing became too dangerous, it was obligated to exercise its discretion in good faith.  *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) ("The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract.").  This construction of the contract best "effectuate[s] the reasonable intent of the parties," *Spring Creek*, 887 F.3d at 1017," because it neither permits Vail to close resorts on a whim nor ties Vail to an overly restrictive obligation untethered from the contract's text.

On the third question, about the effect of no-refund language, Vail argues that its no-refund clause immunizes it from any obligation to compensate plaintiffs.  Plaintiffs respond that the no-refund provision meant that *plaintiffs* could not seek to return their passes for a refund but did not allow Vail to breach their contractual obligations with impunity.  I find that plaintiffs plausibly allege that Vail was obligated to provide refunds if it shuttered its resorts prematurely.

The "no refund" provision is not license for Vail to shirk its contractual obligations.  In a persuasive case out of the Sixth Circuit, the court confirmed a district court's decision that "the word non-refundable cannot be construed as a license to provide little or no consideration and to still retain an advance payment."  *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 726 F. App'x 279, 287 (6th Cir. 2018) (internal citations omitted).  Allowing a seller to abscond with an advance payment simply because of a no-refund clause would be illogical and unjust.

However, I do not agree that *Allied Erecting* and plaintiffs' other cases establish that a no-refund provision is wholly inapplicable in cases where, as here, the seller has allegedly breached a contract.  A no-refund clause can bar recovery when a seller has acted in good faith.

In *Stokes v. DISH Network, L.L.C.*, 838 F.3d 948 (8th Cir. 2016), the Eighth Circuit, applying Colorado law, ruled that a no-refund clause prevented consumers from recovering on a breach of contract action.  *Id.* at 955.  The contract in that case provided that cable subscribers would not be "entitled to any refund because of deletion, rearrangement or change of any programming, programming packages or other Services." *Id.* at 951.  When the consumers sued DISH for temporary interruptions to paid-for channels, the court held that "the express terms of the parties' contractual bargain" "unambiguously precluded" the lawsuit.  *Id.* at 955.

Plaintiffs' attempt to distinguish *Stokes* by claiming that the refund language in that case was specific and unambiguous while Vail's is general and indistinct.  ECF No. 83 at p.9–10.

They claim that *Stokes* is the exception that proves their rule: general refund clauses are inapplicable when the seller fails to perform. *See id.* at p.2. Defendant responds that Vail's no-refund clause is "clear." ECF No. 86 at p.3 n.5.

This back-and-forth over whether Vail's no-refund provision is sufficiently specific misses the point. The no-refund provision in *Stokes* prevented recovery because DISH did not act in bad faith when it interrupted the programming. Consumers complained about one-off, 4-week interruptions to two news channels — out of hundreds offered — while DISH renegotiated agreements with those channels. *Stokes*, 838F.3d at 950. Plaintiffs complained that DISH had breached the covenant of good faith and fair dealing by failing to issue refunds or credits for the channel interruptions. *Id.* at 953. The *Stokes* court found that the covenant of good faith and fair dealing did not require refunds for interruptions caused by DISH "exercise[ing] its discretion to change programming *in good faith*." *Id.* The lesson that I draw from *Stokes* is this: whether a no-refund provision can be ignored when a seller fails to perform services for which it has collected payment depends in part on whether the seller's failure to perform those services was done in bad faith.

Other cases confirm this rule. The parties' relevant cases show no-refund clauses either barring recovery for good-faith breaches or permitting recovery for bad-faith ones. In *Stathakos v. Metro. Tr. Auth. Long Is. R.R.*, 971 N.Y.S.2d 557 (N.Y. App. Div. 2013), a no-refund clause barred recovery by plaintiff train pass holders for occasional cancellations due to severe weather. *Id.* at 979–81. In *Allied Erecting*, the court permitted recovery despite a no-refund clause when a construction company performed enough work to recover its own profits but then declined to

continue work on jobs that would have allowed the other party to recover its advance payment. *Id.* at 288. [5]

The thrust of caselaw cited by the parties thus indicates that an applicable no refund provision will bar recovery for services not performed in good faith. Conceived of differently, this standard finds that a no-refund provision vests the service provider with discretion about whether to issue a refund when it fails to perform under the contract, but that discretion must be exercised in good faith. *See Bloom v. NCAA*, 93 P.3d 621, 624 (Colo. App. 2004) (citing *Hall v. NCAA*, 985 F. Supp. 782, 794 (N.D. Ill. 1997)); *Hall*, 985 F. Supp at 794 ("The covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably."). I find that the no refund clause in the Epic Pass contracts preclude recovery if Vail declined to provide the promised services in good faith.

In sum, plaintiffs plausibly allege that the contract imposed upon Vail the following obligations: Vail had to provide Epic Pass holders "unlimited, unrestricted access" to certain ski areas, meaning it could not limit the number of times that an Epic Pass could be used for entry to a ski area and could not impose holiday blackout dates. Vail had to provide this access for the "ski season," meaning until it determined in good faith that skiing and/or snowboarding safely were no longer possible. Finally, Vail had to compensate passholders if, in bad faith, it failed to provide the promised access.

---

[5] Other cases cited by the parties are inapposite. In *Jacobs v. Metro. Tr. Auth.*, 180 A.D.3d 657 (N.Y. App. Div. 2020), the court found that a plaintiff's failure to follow the procedure for obtaining refunds precluded recovery. *Id.* at 659. Another case, *Martin v. United Airlines, Inc.*, 727 Fed. App'x 459 (10th Cir. 2018), dealt with a situation where airline passengers canceled their tickets. *Id.* at 460. This sheds no light on the effect of a no-refund clause when a service provider fails to provide a service for which it has already collected payment.

I next turn to the question of whether Vail performed its contractual obligations.  Vail shut down its North American ski areas for the 2019-2020 ski season on March 15, 2020.  ECF No. 62 at ¶¶38–39.  Shortly thereafter, Vail announced that it would issue credits to impacted 2019-2020 passholders for between 20% to 80% of the price paid for an Epic Pass.  *Id.* at ¶40.  It offered no cash refunds.  *See id.*

I find that plaintiffs have failed to plead facts sufficient to support their breach of contract claim.  Vail was within its right to close its ski areas when skiing and snowboarding at Vail's ski areas were no longer safe.  That the safety threat came from a deadly virus rather than thinning snow is immaterial — skiing was too dangerous, so Vail closed its resorts.  Plaintiffs nowhere allege that passholders could ski and snowboard safely after March 15, 2020.  They therefore fail to allege that Vail breached its contractual obligations.

Even had the contract obligated Vail to keep its resorts open beyond March 15, 2020, plaintiffs would still fail to state a breach of contract claim.  Their complaint alleges that Vail's breach occurred as a result of it *both* closing the resorts *and* failing to compensate passholders for those closures.  ECF No. 62 at ¶54 ("Vail breached its contracts with Plaintiffs and the Class by retaining the consideration received from Plaintiffs and the Class *while* closing its ski resorts for the remainder of the season." (emphasis added)).  But Vail did not fail to compensate passholders.  It issued Epic Pass credits. [6]  *Id.* at ¶40.  Largely ignoring the credits, plaintiffs' complaint repeatedly requests "refunds" but does not explicitly allege that the contract obligated Vail to compensate passholders in cash and only in cash.  Nor could they.  The contract contains

---

[6] In the parallel case about IKON ski passes, the defendants did not issue any credits.  *See* Order on Motion to Dismiss, ECF. No. 94, Goodrich v. Alterra Mountain Co., No. 1:20-cv-01057-RM-SKC (D. Colo. July 25, 2021).  The court in that case allowed some claims to proceed.  *Id.*

14

no provision authorizing refunds — in fact, it contains a broad no-refund clause. [7] *See* ECF No. 62 at ¶31; ECF No. 104-4 at p.4.

The alleged contractual obligation to compensate passholders for shutdowns must be based on the parties' reasonable expectations that such compensation would be provided.  But it would be unreasonable to expect refunds exclusively in cash.  Merchants regularly compensate customers in free products, discount codes, gift cards, or through other non-cash methods.  If Vail had, for example, decided to give all passholders free Epic Passes for life, plaintiffs could not complain that this remedial action violated their reasonable expectations for cash compensation.  The contracting parties may have reasonably expected adequate compensation in the event of an unexpected closure, but they could not have expected cash only.

Instead, plaintiffs' position seems to be that the credits Vail offered were insufficient compensation.  The record fails to support — and even contradicts — this assertion.  Plaintiffs do not tell us what "core" season was advertised for the 2019-2020 ski season.  They do not even estimate how many days or weeks of skiing were lost to COVID.  The record before me does show, however, that the following year's "core" season ran from December 8, 2020 to April 4, 2021.  ECF No. 83 at p.9.  Had Vail closed its resorts on March 15 of 2021, it would have done so after allowing Epic Pass holders unlimited and unrestricted access to its resorts for over 82% of its core season.  A credit promising, at a minimum, a 20% credit for next year's Epic Pass would not be insufficient.  It could be viewed as generous.  Moreover, the credits were not de

---

[7] As discussed above, the clause did not totally immunize Vail from any liability, but it may impact Vail's obligations under the contract.  I must read clauses "in the context of the entire contract" to "effectuate the intent and reasonable expectations of the parties." *Copper Mountain*, 208 P.3d at 696.  A party that reads a broad no refund provision like the one at issue here might have different "reasonable expectations" about what could be expected if they wanted to recover money already paid.

minimus from Vail's perspective.  Redemption of the credits cost Vail $106 million as of

September 18, 2020.  *Vail Resorts Reports Fiscal 2020 Fourth Quarter and Full Year Results and*

*Provides Preliminary Season Pass Sales Results*, VAIL RESORTS (Sept. 24, 2020), (hereinafter "*Vail*

*Fiscal 2020 Results*") http://investors.vailresorts.com/news-releases/news-release-details/vail-resorts-

reports-fiscal-2020-fourth-quarter-and-full-year (cited in plaintiffs' Consolidated Amended Class

Action Complaint, ECF No. 62, at ¶19 n.1).  Had Vail not issued credits, revenue from Epic Pass

sales would have increased by 24%.  *Id.*  With the credits, they declined by 4%.

Plaintiffs note that the credits could only be redeemed until September 17, 2020, when

uncertainty about the upcoming ski season still existed.  ECF No. 62 at ¶¶40–41.  Yet they do not

allege that this early decision date is what rendered the refunds insufficient.  Nor could they

plausibly make such an argument.  Vail announced new "Epic Coverage" for all passes,

including those purchased with credits, that promised "a refund" not only for COVID-related

closures but also for "injury, job loss, or other personal events" that might prevent an individual

from using their pass. *Vail Announces 19/20 Pass Holder Credits and 'Epic Coverage' for 20/21*

*Season*, VAIL RESORTS (Apr. 27, 2020), available at:

http://news.vailresorts.com/corporate/vailresorts/vail-resorts-announces-1920-pass-holder-

credits-and-epic-coverage-for-2021-season.htm (cited by plaintiffs, ECF No. 62, at ¶40 n.11).

Passholders concerned about travel risks or COVID closures could have purchased passes with

their credits knowing that they would be entitled to refunds if circumstances prevented them

from skiing.

Plaintiffs choose instead to repeatedly assert that Vail "refuse[d] to offer a refund of any

kind." ECF No. 62 at ¶41.  This claim is contradicted by the record, and I need not assume its

veracity for purposes of this order.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that a

court need not accept a party's claim "which is blatantly contradicted by the record" even when construing facts in the light most favorable to that party).

Plaintiffs fail to state a claim for breach of contract.  Vail did not close its resorts prematurely, it closed when skiing was no longer safe.  Nor did Vail fail to compensate plaintiffs, it issued satisfactory credits.  Plaintiffs claim that Vail's breach was the combined effect of premature resort closure and failure to refund.  Because neither claim is plausible on the face of the complaint, plaintiffs' breach of contract claim is dismissed.

2.   Regional Epic Passes, Specialty Epic Passes, and Epic Day Passes

For Regional Epic Passes, Specialty Epic Passes, and Epic Day Passes, plaintiffs do not allege that Vail promised "unlimited unrestricted access."  Nonetheless, they claim that that Epic Day Pass holders[8] "expected that the Pass would confer unlimited access throughout the entire 2019-2020 ski season."  ECF No. 62 at ¶10.  Such an expectation is untethered from the contract and unsupported by the record.  Plaintiffs do not allege a breach of contract regarding Regional, Specialty, and Epic Day Passes because they do not plead a basis for such passholders to expect expansive access to Vail's resorts beyond March 15, 2020.

Even if expecting "unlimited, unrestricted access" were reasonable regarding Regional, Specialty, and Epic Day Passes, the same analysis as above would apply.  I therefore find that plaintiffs fail to state a claim for breach of contract.

_____

[8] None of the named plaintiffs claim to have purchased Regional Epic Passes or Specialty Epic Passes.  *See* ECF No. 62 at ¶¶ 8–14.

### C. **Breach of Express Warranty**

To state a claim for breach of express warranty, a plaintiff must prove (1) the existence of a warranty, (2) breach of the warranty, (3) proximate causation, and (4) timely notice to the defendant of the breach. *Fiberglass Component Prod., Inc. v. Reichhold Chems., Inc.*, 983 F. Supp. 948, 953 (D. Colo. 1997) (citing *Palmer v. A.H. Robbins Co.*, 684 P.2d 187 (Colo.1984)). Under Colorado law, express warranties are created when a seller, *inter alia*, affirms a fact or makes a promise to the buyer which "becomes part of the basis of the bargain." COLO. REV. STAT. § 4-2-313(1)(a) (2020). A seller need not use specific language like "warrant" or "guarantee" to create an express warranty. *Id.* at §4-2-313(2).

Plaintiffs state that "Vail created an express warranty through its advertising statements that the Passes would provide 'unlimited, unrestricted access' to its ski areas through the 2019-2020 season" and through its other statements referencing an "entire . . . season." ECF No 62 at ¶ 59.

Assuming that the Epic Passes fall under Colorado's warranty statute, I find that plaintiffs have failed to state a claim for breach of express warranty. Plaintiffs claim that Vail's promises to provide "unlimited, unrestricted access" or access for an entire ski season became part of the basis of the bargain. I must accept this factual contention at this stage of litigation. However, plaintiffs do not allege facts sufficient to find that Vail breached this warranty. As discussed above, the promise that a pass would provide "unlimited, unrestricted access" was a promise to impose no cap or holiday blackout dates on that pass.[9] Plaintiffs do not allege that Vail imposed

---

[9] Moreover, plaintiffs do not allege that Specialty, Regional, or Epic Day Passes were promised "unlimited, unrestricted access."

such limits or restrictions.  Vail's promise to provide access for an entire ski season was a promise to keep resorts open until it determined in good faith that skiing and snowboarding were no longer safe.  Plaintiffs do not allege that skiing or snowboarding were safe after Vail closed its resorts.  Finally, even assuming — despite the no-refund clause — that an implicit promise by Vail "to issue partial refunds" became part of the basis of the bargain, ECF No. 62 at ¶61, the record shows that Vail did issue such refunds when it offered $121 million in credits, *see Vail Fiscal 2020 Results*.

### D.  Breach of Implied Covenant of Good Faith and Fair Dealing

"Under Colorado law, every contract contains an implied duty of good faith and fair dealing*." City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).  Breach of this duty gives rise to a claim for breach of contract.  *Id*.  "The duty of good faith and fair dealing may be relied upon 'when the manner of performance under a specific contract term allows for discretion on the part of either party.'"  *Id.* (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)).

The implied duty of good faith and fair dealing "is breached when a party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract."  *ADT Sec. Servs., Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007).  The duty of good faith, however, cannot be used to "contradict terms or conditions for which a party has bargained"; "obligate a party to accept a material change in the terms of the contract"; "assume obligations that vary or contradict the contract's express provisions"; or "permit a party to inject substantive terms into the contract."  *Id.*  It also cannot be used to "establish[] new, independent rights or duties."  *Stokes*, 838 F.3d at 953.

Plaintiffs assert that Vail breached the covenant of good faith and fair dealing "by failing to refund to Plaintiffs and the Class the money paid for the unusable portion of their Epic Passes." ECF No. 62 at ¶67. They claim that Vail's failure to refund money deprived plaintiffs of "some benefit of the bargain originally intended by the parties" and that this failure to refund was "dishonest[] and/or outside the scope of accepted commercial practices." *Id.* at ¶68.

Neither plaintiffs' premises nor their conclusions withstand scrutiny. First, Vail did not fail to refund money; it offered credits towards future purchases. Second, for the reasons articulated above, the parties could not reasonably have "originally intended" that Vail would issue cash refunds. Finally, Vail's decision to shutter ski operations in response to a deadly worldwide pandemic that had already been classified a national emergency, ECF No. 62 at ¶35 — and whose transmission had been specifically linked to ski resorts, *id.* at ¶37 — was neither dishonest nor outside accepted commercial practices. Forgoing profits for the health of one's customers is not dishonest. And Closing down a business when required to do so by state and local officials is well within accepted commercial practices. *See id.* at ¶36. Given the propriety of Vail's closing its resorts, its decision to offer credits was not dishonest or outside commercial practices. Plaintiffs fail to state a claim for breach of implied covenant of good faith and fair dealing.

### E.  <u>Quasi-Contract Claims</u>

Quasi-contracts, often called contracts implied in law, are "are obligations created by law for reasons of justice." Restatement (Second) of Contracts § 4 cmt. b (1981). They award restitution when "inequity would result" from a defendant retaining a benefit already conferred by a plaintiff. *Fischer Imaging Corp. v. Gen. Elec. Co.*, 187 F.3d 1165, 1172 n.7 (10th Cir.

1999) (citing *DCB Const. v. Central City Dev. Co.*, 965 P.2d 115, 119 (Colo. 1998)).  Plaintiffs

assert two such claims: unjust enrichment and money had and received.

      1.  <u>Unjust Enrichment</u>

      "Unjust enrichment is a form of quasi-contract or contract implied in law that does not

depend in any way upon a promise or privity between the parties."  *Robinson v. Colo. State*

*Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).  To recover under an unjust enrichment theory, a

plaintiff must show that "(1) at plaintiff's expense (2) defendant received a benefit (3) under

circumstances that would make it unjust for defendant to retain the benefit without paying."  *Id.*

      However, "a party cannot recover for unjust enrichment by asserting a quasi-contract

when an express contract covers the same subject matter because the express contract precludes

any implied-in-law contract."  *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77

P.3d 814, 816 (Colo. App. 2003); *see also W. Ridge Grp., LLC v. First Tr. Co. of Onaga*, 414 F.

App'x 112, 120 (10th Cir. 2011).  There are two exceptions that permit recovery on a quasi-

contract despite the existence of an express contract: a party may recover when (1) the quasi-

contract "covers conduct outside the express contract or matters arising subsequent to the express

contract," or (2) "the party will have no right under an enforceable contract," such as "when an

express contract failed or was rescinded."  *Interbank Invs.*, 77 P.3d at 816 (internal quotation

marks and citations omitted).

      Defendant argues that an express contract governs the parties' relationship and precludes

all quasi-contract claims.  ECF No. 74 at p.9.  Plaintiffs respond in three ways.  First, they argue

that the Federal Rules of Civil Procedure (FRCP) permit alleging inconsistent claims in the

alternative.  ECF No. 83 at p.10.  They similarly assert that pleading quasi-contract claims in the

alternative is permissible when as here, a party argues that a contract may be unenforceable.  *Id*

at p.11.  Finally, they argue that their unjust enrichment claim falls within the exception permitting quasi-contract claims for matters outside the scope of the express contract, *see Interbank Invs.*, 77 P.3d at 816, because "the contract as a whole does not address whether and when *Vail* may cancel without issuing a refund," ECF No. 83 at p.11.

Plaintiffs are correct that the FRCP permit pursuing conflicting theories of liability at the pleadings stage.  *See* Fed. R. Civ. P. 8(d)(2)-(3).  Their claim will not be dismissed for inconsistency alone.

However, plaintiffs cannot survive defendant's motion to dismiss unless they "state a claim on which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The question remains whether plaintiffs' unjust enrichment claim "allows the court to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. at 678.  This requires either a finding that there is no enforceable express contract or a finding that plaintiffs' claim falls into one of the two established exceptions.  *Interbank Invs.*, 77 P.3d at 817 ("Alternative pleading [] does not limit the principle that an express contract precludes an implied contract on the same subject matter.").

Plaintiffs' second justification for their unjust enrichment claim, that they may plead quasi-contract in the alternative because they claim the express contract is unenforceable, holds no water.  This argument requires their alternative claim — that the express contract does not exist — to be well-pled.  However, I have construed the parties' contractual obligations and found that the contract is not illusory.  Plaintiffs' attempt to skirt the ban on quasi-contract claims when an express contract governs fails because their attempt to undermine the express contract is not "plausible on its face."  *Twombly*, 550 U.S. at 570.

Because an express contract governs the parties' relationship, plaintiffs may only proceed with their unjust enrichment theory if they fall within one of the two established exceptions.  *See*

22

*Interbank Invs.*, 77 P.3d at 816.  The alleged quasi-contract must either cover conduct outside or subsequent to the express contract, or else plaintiffs must show they have no right under an enforceable contract.  *Id.*

Plaintiffs' claim does not fall within the first exception for conduct outside the express contract.  It is a question of law whether an express contract covers the same conduct as, and therefore supersedes, a quasi-contract.  *Id.* at 816–17.  Plaintiffs contend that the contract's no-refund provision establishes the remedial scheme if a *passholder* wishes to rescind, but the document does not cover *Vail*'s non-performance of its contractual obligations.  This does not make sense.  A contract inherently governs non-performance of a contract.  *See id.* at 817 ("[T]he contracts contemplated payment . . . , and the risk of nonpayment inheres in these as well as in most other contracts.").  A party that fails to perform its contractual obligations is liable for breach of contract because the act of contracting changes the legal effect of failing to fulfill those obligations.  Parties are free to specify remedies for nonperformance that differ from the general remedies available in breach-of-contract actions, but failure to deviate from the legal baseline does not mean that a party's nonperformance is "outside" the express contract.

Plaintiffs' citation to *Carrio Cabling Corp. v. Stryker Corp.*, 2020 WL 7130095 (D. Colo. Apr. 2, 2020), for the proposition that ambiguity in a contract precludes dismissal, is unavailing.  ECF No. 83 at p.11.  In *Carrio Cabling*, the court found it unclear whether a barebones contract promised consideration for only a widget or also for the design processes behind the widget.  *Id.* at *9.  Because the *Carrio Cabling* plaintiff sought unjust enrichment only for the design processes, the court found it plausible that the contract might cover different subject matter; namely, only the widget itself.  *Id.*  If that were the case, then the quasi-contract claim on the design processes would have been outside the scope of the contract for the widget.  The court did

23

not say, as plaintiffs here imply, that any ambiguous provision in a contract precludes dismissal of unjust enrichment claims based on breach of that same contract.

Nor does plaintiffs' claim fall within the second exception for situations where a plaintiff has no remedy under an enforceable contract, such as when a contract fails or is rescinded. *See Interbank Invs.*, 77 P.3d at 816. This "highly fact-intensive inquiry" asks whether injustice would result from a defendant's failure to compensate the plaintiff for a benefit received. *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000). It "often will turn on whether a party engaged in some type of wrongdoing." *Id.*

Plaintiffs do not fall within this exception because they *do* have a remedy under the enforceable contract with Vail: breach of contract. The fact that plaintiffs have not plausibly pled breach of contract does not entitle them to an unjust enrichment claim.

Cases falling within this exception confirm my conclusion — they are quite different from the case at hand. In one case, the Colorado Supreme Court held that a contingency-fee lawyer may recover on an unjust enrichment claim when the client discharges the attorney without cause. *Dudding*, 11 P.3d at 446–47. The court emphasized that barring such a remedy might allow a client to "receive significant value from an attorney's legal services" and then refuse to tender payment by, for example, discharging the attorney just before securing a settlement.

In another case, an unjust enrichment claim could proceed where a property seller refused to pay the real estate brokers. *Backus v. Apishapa Land & Cattle Co.*, 615 P.2d 42, 44 (Colo. App. 1980). The deal had involved two brokers, one from Texas and one from Colorado. The Colorado broker assigned his rights to the Texas broker who subsequently found out that he could not sue the land seller unless he held a Colorado real estate license. *Id.* at 43. The court

24

found that even though the Texas broker had no right under the enforceable contract between the seller and Colorado broker, it would be unjust to allow the seller to retain the benefit conferred by both brokers without compensating them as he had promised to do. *Id.*

The defendants in these cases had used legal technicalities to avoid paying sums they clearly owed. Vails has done no such thing. It was never clear that Vail owed refunds, but even if it had, Vail issued credits. Vail is not exploiting a legal loophole to avoid fulfilling its obligations on an enforceable contract.

### 2.  Money Had and Received

"A plaintiff can maintain an action for money had and received whenever the defendant has received money which, in equity and good conscience, he ought to pay over." *Monday v. Robert J. Anderson, P.C.*, 77 P.3d 855, 857 (Colo. App. 2003) (internal citation omitted). When a contract governs the parties' relationship, a plaintiff must show that the defendant breached a "duty independent of their contractual obligations;" otherwise the economic loss rule will preclude a claim for money had and received. *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000); *see also id.* at 1270 ("An action to recover damages for the loss of a bargain is the exclusive province of contract law.").

The economic loss rule prevents plaintiffs' claim for money had and received. Plaintiffs base this claim on Vail's closure of its ski areas and failure to issue refunds — the same actions underlying Vail's alleged breach of contract. *See* ECF No. 62 at ¶77. Were Vail required to keep its resorts open or issue cash refunds, those obligations would derive from the parties' contract. Plaintiffs do not plausibly allege a basis for these obligations beyond the contract. Because plaintiffs have not alleged "that any duty independent of the oral and written contracts was breached," *Grynberg*, 10 P.3d at 1269, their claim for money had and received is dismissed.

25

Plaintiffs' alternative pleading cannot rescue their claim. They apparently rely on *Hollander v. Zito*, No. 11-CV-00499-MSK-BNB, 2011 WL 5834688 (D. Colo. Nov. 21, 2011), a case declining to apply the economic loss rule and dismiss a claim for money had and received when the plaintiff may have been entitled to rescind the contract, *id.* at *6. *Hollander* is distinguishable from this case. In *Hollander*, the plaintiff's claimed basis for contract recission was fraud in the inducement, a fact-specific claim assessable only after further development of the record. *See id.* Here, plaintiffs claim that the contract may be rescinded because Vail's promise was illusory. This is a legal question of contract interpretation. Because I have found that the contract was not illusory, the *Hollander* exception does not apply.

Nor have plaintiffs alleged a "special relationship" that created an independent duty of care and might support a tort action despite the governing contract. *Grynberg*, 10 P.3d at 1271; *see also Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 83 (Colo.1999)(attorney-client relationship creates independent duty of care); *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo.1993)(physician-patient relationship creates independent duty of care, as does physician's independent medical examination of non-patient); *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141-42 (Colo.1984)(quasi-fiduciary nature of insurer-insured relationship creates independent duty of care).

Plaintiffs therefore fail to "state a claim on which relief can be granted." Fed. R. Civ. P. 12(b)(6).

## F.  **State Consumer Protection Claims**

Plaintiffs assert claims under various state laws on behalf of putative state subclasses. *See* ECF No. 62 at ¶¶43, 80–157. Defendant argues that a choice-of-law provision bars these statutory claims. The use of Vail's website, through which all named plaintiffs purchased their

passes, was governed by Colorado law.  Defendant contends that Colorado's substantive and choice-of-law rules preclude claims based on other states' consumer protections statutes.  ECF No. 74 at p.10–11.  Plaintiffs respond that the choice-of-law provision does not bar plaintiffs' non-Colorado claims.  ECF No. 83 at p.12.

I need not conduct a choice-of-law analysis to decide the issue before me.  Assuming without deciding that the choice-of-law provision does not bar non-Colorado claims, I find that plaintiffs have failed to state claims under the other states' consumer protection statutes.

Plaintiffs' theory of liability is as follows: (1) Vail promised "unlimited, unrestricted access" to its resorts for the entire ski season; (2) consumers reasonably interpreted this promise to mean that Vail would refund their money if such access was not provided; (3) Vail misrepresented the passes' benefits and/or omitted material facts by allowing plaintiffs to rely on their reasonable expectation of refunds without informing them that Vail would not provide such refunds; (4) therefore, Vail's actions expose them to liability under various state's specific consumer protection statutes.  *See, e.g.*, ECF No. 62 at ¶ 97 ("Vail engaged in unfair competition and unfair, unlawful, and/or fraudulent business practices by the conduct, statements, and omissions described above, and by misleading and concealing from Plaintiffs and Class members that, despite reasonable consumer expectations to the contrary, Vail would not return any portion of the money paid for 2019-2020 Epic Passes if Vail failed to provide the 'unlimited, unrestricted' access it advertised.").

The problem with this chain of reasoning is that the second and third premises cannot be true.  First, despite plaintiffs' claims that Vail failed to provide refunds when it breached the contract, plaintiffs do not plausibly allege that Vail *did* violate its promise to provide "unlimited, unrestricted access" through the end of the ski season.  *See supra*.  I therefore have no evidence

27

of what Vail would have actually done had it failed to provide the promised access. Without such evidence of Vail's actions in such a scenario, it is impossible to conclude that Vail's actions would have differed from what they purportedly represented they would do.

Even had plaintiffs plausibly alleged that Vail breached its promise to provide "unlimited, unrestricted access," they provide no basis for the claim that Vail promised refunds. Plaintiffs argue that "reasonable consumer[s]" expected refunds based on Vail's advertisements and representations. *See, e.g.*, ECF No. 62 at ¶140. The record does not support this claim.

Vail never used language typically understood to allow a refund. They never promised, for example, "unlimited, unrestricted access *or your money back*." Nor could Vail's representations that it would provide "unlimited, unrestricted access" be reasonably understood as a promise to issue cash refunds. That language is reasonably understood to promise access for an unlimited number of days without holiday blackout dates. *See supra* (noting that the "unlimited, unrestricted" promises were placed alongside promises of "limited" access (for a set number of days) and "restricted" access (with holiday blackout dates), ECF No. 101-3). Moreover, Vail's representations explicitly called the passes "non-refundable" unless insurance was purchased and disclaimed "refunds of any kind." ECF No. 62 at ¶ 31; ECF 102-1 at p.1. The material before plaintiffs might have led them to reasonably expect some type of compensation in the event of unforeseeable shutdowns, but plaintiffs allege no basis for a reasonable expectation that Vail would provide cash refunds rather than other compensation like the credits Vail actually did provide.

Keeping these conclusions in mind, I examine each state law claim in turn.

1.  The California Consumer Legal Remedies Act

The California Consumer Legal Refmedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.* (West 2021), prohibits a person from engaging in unfair or deceptive acts or practices in the sale of good or services to consumers.  *Id.*  Plaintiffs allege liability under the following three provisions of the CLRA:

> (a)(5) Representing that the goods or services have sponsorship, characteristics, uses, benefits, or qualities which they do not have;

> (a)(7) Representing that the goods or services are of a particular standard, quality, or grade, or that the goods re of a particular style or model, if they are of another; and

> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

CAL. CIV. CODE § 1770.

Stating a claim under §§ 1770(a)(5) and (a)(7) of the CLRA requires a plaintiff "allege: (1) a misrepresentation; (2) reliance on that misrepresentation; and (3) damages caused by that misrepresentation." *In re Sony PS3 Other OS Litig.*, 551 F.App'x 916, 920 (9th Cir. 2014) (unpublished).  A plaintiff need not plead fraud to state a claim under sections 1770(a)(5) and (a)(7).  *Id.*  To state a claim under § 1770(a)(9), however, requires pleading "intent to defraud, which, in turn, implies knowledge of the falsity."  *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1003 (N.D. Cal. 2009).

The alleged misrepresentation plaintiffs identify is defendant's "mis[leading] and conceal[ing]" that "it would not return the unusable portion of the cost of the 2019-2020 Epic Passes if Vail failed to provide the 'unlimited, unrestricted' access advertised."  ECF. No. 62 at ¶85.  Defendant responds with both procedural and substantive arguments.  Procedurally, they argue that Epic Passes are not "goods or services" within the meaning of the CLRA.  *See* ECF

29

No. 74 at pp. 10–11, 15.  Substantively, defendant argues that there was no actionable misrepresentation, omission, or unfair conduct because Vail never promised a ski season of definite length, could not have known what would happen in the event of a global pandemic, fully disclosed its no-refund policy, and adhered to its stated policies.  *See id.* at 12–14.

Assuming without deciding that Epic Passes are "goods or services" as defined by the CLRA, I find that plaintiffs fail to state a claim for relief under the CLRA.  As discussed above, plaintiffs do not plausibly allege a "misrepresentation," which is an essential element of a CLRA claim.  *See In re Sony PS3*, 551 F.App'x at 920.  This claim is dismissed.

### 2.  The California Unfair Competition Law

The California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17500, *et seq.*, prohibits, inter alia, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."  *See id.*  An action need not be otherwise unlawful to violate the UCL.  *Zhang v. Superior Ct.*, 304 P.3d 163, 167 (Cal. 2013).  The UCL limits plaintiffs to injunctive relief and restitution but "does not mandate [such] relief when an unfair business practice has been shown." *Cortez v. Purolator Air Filtration Prod. Co.*, 999 P.2d 706, 717 (Cal. 2000).  The Supreme Court of California has "emphasized that the equitable remedies of the UCL are subject to the broad discretion of the trial court," which should issue orders or judgments only after considering the equities on both sides.  *Zhang*, 304 P.3d at 167.

Plaintiffs fail to state a claim for relief under the UCL.  Plaintiffs argue that "Vail misleadingly omitted and failed to disclose that it would not return to passholders the unusable portion of the 2019-2020 Epic Passes if 'unlimited, unrestricted' access [to its resorts] was not provided.  ECF No. 62 at ¶111.  For the same reasons discussed above, I find plaintiffs'

unsupported by the record.  Plaintiffs fail to plausibly allege a claim under the UCL.  This claim is dismissed.

### 3.   The California False Advertising Law

Plaintiffs withdrew their claim under the California False Advertising Law ("CFAL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*  ECF No. 83 at p.14 n.12.  That claim is dismissed.

### 4.   New York General Business Law § 349

New York's consumer protection law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. GEN. BUS. LAW § 349 (McKinney 2021).  The state's highest court limits actionable "deceptive acts or practices" to only those "representations or omissions . . . likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 744 (N.Y. 1995).

Assuming without deciding that the contractual choice-of-law provision does not bar claims under New York law, plaintiffs fail to state a claim for relief under New York's consumer protection law.  As discussed above, Vail's representations and alleged omissions were not "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Id.*  Plaintiffs fail to plausibly allege a claim under New York's consumer protection statute.  This claim is dismissed.

### 5.   The Illinois Consumer Fraud and Deceptive Business Practices Act

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILL. COMP. STAT. 505/1, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices" in the conduct of trade or commerce.  *Id.* at 505/2.  The elements of an ICFA claim include "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's

intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). Deceptive or unfair acts include, but are not limited to, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, . . . in the conduct of any trade or commerce." 815 ILL. COMP. STAT. 505/2.

Assuming without deciding that the contractual choice-of-law provision does not bar claims under Illinois law, plaintiffs fail to state a claim for relief under the ICFA. Vail's actions were not "deceptive," as the act requires. *See id.* Moreover, the ICFA requires an intent to misrepresent. *See id.* Plaintiffs do not claim Vail had such an intent. They claim that Vail engaged in unfair practices "in connection with transactions that were intended to result in, or that did result in, the sale of 2019-2020 Epic Passes." ECF No. 62 at ¶ 135. Intent that transactions result in the sale of passes is not that same as intent that consumers rely on misrepresentations.

Plaintiffs fail to plausibly allege a claim under the ICFA. This claim is dismissed.

### 6.   The Florida Deceptive and Unfair Trade Practices Act

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. § 501.201, *et seq.* (2021), prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* at § 501.204. To recover under the FDUTPA, a consumer must show a defendant's "deceptive act or unfair practice." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). A deceptive act is one that is "likely to mislead" consumers. *Davis v. Powertel, Inc.*, 776 So. 2d

971, 974 (Fla. Dist. Ct. App. 2000).  An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. Dist. Ct. App. 2001) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)).

Assuming without deciding that the contractual choice-of-law provision does not bar claims under Florida law, plaintiffs fail to state a claim for relief under the FDUTPA.  Vail's practice was not "deceptive" because it was not "likely to mislead" consumers.  *See Davis*, 776 So. 2d at 974.  It was not "unfair" because shuttering ski resorts linked to a deadly global pandemic, losing profits because of this decision, and nonetheless issuing credits to consumers is not "immoral," "unethical," or "substantially injurious to consumers."  *See id.*  This claim is dismissed.

### 7.   The Washington Consumer Protection Act

The Washington Consumer Protection Act ("WCPA"), WASH. REV. CODE § 19.86.010, *et seq.* (2020), prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* at § 19.86.020.  To recover under the WCPA, a plaintiff must show that a defendant's alleged act "had the capacity to deceive a substantial portion of the public."  *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986).

The WCPA "mandates that it be liberally construed to serve its purposes."  *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 891 (Wash. 2009) (citing WASH. REV. CODE § 19.86.920).  The Act's "purpose" section explicitly states that the "act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest."  WASH. REV. CODE § 19.86.920.

Assuming without deciding that the contractual choice-of-law provision does not bar claims under Washington law, plaintiffs fail to state a claim for relief under the WCPA.  Vail's actions did not "ha[ve] the capacity to deceive a substantial portion of the public."  *Hangman Ridge*, 719 P.2d at 535.  Moreover, Vail's actions do not fall under the WCPA's ambit because they were "reasonable in relation to the development and preservation of business" and beneficial, not injurious, to the public interest.  *See* WASH. REV. CODE § 19.86.920.

## ORDER

For the above reasons, defendant's 12(b)(6) motion to dismiss for failure to state a claim is GRANTED.  This case is DISMISSED with prejudice.  As the prevailing party, defendant is awarded costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 15th day of October, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

34